**Opinion issued April 27, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00826-CV

————————————

## IN THE INTEREST OF B.S., A CHILD

---

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Case No. 20CP0215**

---

## MEMORANDUM OPINION

This is a suit by the Texas Department of Family and Protective Services ("DFPS") to terminate a parent-child relationship. After a bench trial, the trial court terminated the parental rights of appellant S.H. ("Mother") to her minor child,

"Beth,"[1] based on its findings under subsections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code and its finding that termination of the parent-child relationship was in the child's best interest.[2] The trial court appointed DFPS as the managing conservator of the child.

In this accelerated appeal,[3] Mother challenges the trial court's order terminating her parental rights. In her sole issue, she contends that the evidence at trial was legally and factually insufficient to support the trial court's findings that she engaged in the predicate acts set forth in subsections 161.001(b)(1)(D), (E), and (O), and that termination of her parental rights is in Beth's best interest.

We affirm.

## Background

Beth was born in 2019. On December 31, 2020, DFPS filed a petition for the protection of Beth, seeking managing conservatorship and the termination of Mother's parental rights. By affidavit attached to the petition, DFPS Investigator J.

---

[1] Pursuant to the Texas Rules of Appellate Procedure, we use an alias to refer to the child and to her parent. *See* TEX. R. APP. P. 9.8(b)(2) (providing that, in parental-rights termination cases, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member"). In its brief, DFPS refers to the child as "Beth."

[2] *See* TEX. FAM. CODE § 161.001(b)(1)(D) (placing child, or allowing child to remain, in conditions or surroundings that endanger child), (E) (conduct endangering child), (O) (failing to comply with provisions of order establishing actions necessary to obtain return of child), (b)(2) (best interest).

[3] *See id.* § 263.405(a); TEX. R. APP. P. 28.4.

2

Meyers testified that, in October 2020, law enforcement officers were dispatched to Mother's house to investigate an assault "between" Mother and Beth's father ("Father")[4] that occurred while Beth and her two older siblings were present. Meyers noted that Beth's older brother "was in tears when speaking with law enforcement and said that [Father] was beating [Mother] up."

Meyers also testified that, on December 26, 2020, DFPS received an allegation of neglectful supervision. Specifically, a person delivering newspapers reported to the La Marque Police Department that, at 2:00 that morning, he had observed a "small, white baby going in and out of [Mother's] residence several times with no adult around." Officer K. Ladd was dispatched to investigate. When Officer Ladd arrived at Mother's house, she noted that the house "smelled like marijuana." However, she established the Beth was safely inside the house with Mother.

Meyers testified that, an hour later, however, Officer Ladd and other officers were again dispatched to Mother's house. Mother reported that Father had hit and choked her in front of Beth. Mother also stated that Father had run over her foot with his car. Officer Ladd noted that "the more [Mother] talked," however, "the more convinced officers became that she was lying and that she was actually the aggressor." When Officer Ladd informed Mother that the incident would be

---

[4] Father is not a party to this appeal. Although DFPS, in its petition, also sought to terminate Father's parental rights to Beth, the record shows that Father died during the course of the proceedings.

reported to DFPS, Mother responded that DFPS was "just going to take her kids away again" and that "she was just going to move."

On December 30, 2020, Meyers went to Mother's house but found it unoccupied. Subsequently, Meyers had difficulty locating Beth to determine her welfare. Mother's friend told Meyers that he was worried about Beth because Mother was "using drugs and not acting right." He spoke with Mother and tried to convince her to allow Meyers to see that Beth was safe. The friend explained to Meyers that Mother refused because she was scared and "so strung out on drugs."

Meyers later found Beth at a residence in the care of Randy Miller, Fernando Torres, and Brandy Alicorn. Meyers noted that Miller had a recent conviction for possession of methamphetamines, Torres was a registered gang member, and Alarcon's children were in DFPS custody and the subject of a termination suit. Meyers found Beth in the living room of the house, lying on a bare mattress near a half-empty bottle of malt liquor. Fernando said that Beth had been in his care for four days, that Mother had been evicted from her house, and that he had no way to reach her.

On December 31, 2020, the trial court entered an emergency order for the protection of Beth, finding that there existed an immediate danger to her physical health or safety. It named DFPS her temporary sole managing conservator. After a

4

hearing, the trial court ordered that Mother comply with the requirements set out in a DFPS Family Service Plan ("FSP").

On September 27, 2021, DFPS filed a Motion to Retain the Suit on the Court's Docket and Set a New Dismissal Date. In the motion, DFPS noted that the trial court had first appointed DFPS as Beth's temporary managing conservator on December 31, 2020, that the case was set for trial on December 6, 2021, and that, pursuant to the Family Code, the mandatory dismissal date was January 3, 2022.[5] DFPS asked the trial court to retain the suit on its docket and set a new dismissal date of July 2, 2022.[6]

Subsequently, the trial court signed an order retaining the suit, resetting trial for May 23, 2022, and setting a new dismissal date of July 2, 2022.

On April 26, 2022, the trial court granted a motion by DFPS for the monitored return of the child. The trial court ordered that DFPS return Beth to Mother and that

---

[5]    *See* TEX. FAM. CODE § 263.401(a) ("Unless the court has commenced the trial on the merits or granted an extension . . . , on the first Monday after the first anniversary of the date the court rendered a temporary order appointing [DFPS] as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by [DFPS] that requests termination of the parent-child relationship . . . is terminated and the suit is automatically dismissed without a court order . . . .").

[6]    *See id.* § 263.401(b) (authorizing trial court to retain suit on its docket for period not to exceed 180 days after period described in subsection (a)).

5

DFPS continue to serve as managing conservator and monitor the safety of the placement. The trial court set a date of October 22, 2022 for dismissal of the suit.[7]

On July 26, 2022, J. Hatcher, the appointed attorney ad litem for the child, moved to revoke the monitored return of the child to Mother. Hatcher presented evidence that, on June 23, 2022, the Texas City Police Department was called to Mother's home to investigate an assault, namely, a complaint by Mother's boyfriend that she had twice punched his face. As a result of the investigation, a warrant was issued for Mother's arrest. Hatcher also presented evidence that, on July 2, 2022, Mother was arrested for the offense of driving while intoxicated in Manvel, Texas.

Further, Hatcher presented evidence that, on July 22, 2022, the State had moved to adjudicate Mother's guilt for a January 2021 offense of possession of a controlled substance (methamphetamine). The State alleged that, not only had Mother violated the conditions of her community supervision by becoming intoxicated and violating the law, but that she had failed to complete drug-education.

On August 2, 2022, the trial court issued an order revoking Beth's monitored return to Mother.

---

[7] *See id.* § 263.403(a) ("Notwithstanding Section 263.401, the court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order that . . . orders [DFPS] to . . . return the child to the child's parent . . . ."), (b) (requiring trial court to schedule new date for dismissal).

Trial was held on October 12, 2022, and Mother did not attend. When the trial court inquired about Mother's absence, her attorney stated simply that she was "AWOL."

Meyers testified at trial that, on December 26, 2020, a newspaper-delivery man had reported to law enforcement that he had seen a small child, "around age of two," outside Mother's house at 2:00 in the morning. When officers arrived, they noted that Mother's house smelled like marijuana. Once they determined that Beth was safely inside the house, they left. "They were called back within a short time," however, because Mother alleged that she had been assaulted by Father. Law enforcement reported the incident to DFPS, and Meyers was assigned to investigate.

Meyers ultimately found Beth at a residence in the care of Randy Miller, Fernando Torres, and Brandy Alicorn. Meyers noted that Miller had a recent conviction for possession of methamphetamines, and Torres was a registered gang member. Alicorn's children "had been removed from her care due to allegations of drugs," and "she had a restriction that [she] shouldn't be around her children unsupervised." Meyers found Beth in the house, lying on a "dirty bare mattress on the floor," with a half-empty bottle of beer near her. Torres said that Beth had been in his care for four days and that he did not have a way to reach Mother. DFPS conducted an emergency removal of Beth and placed her back into foster care with her previous caregiver.

7

C. Kalichman, a DFPS conservatorship worker, testified that DFPS identified Mother's greatest barrier to reunification to be her "extensive history of drug usage, controlled substances, methamphetamine in particular, and DWI arrest."

The trial court admitted into evidence a judgment reflecting that, in 2013, Mother committed the offense of possession of a controlled substance (methamphetamine) and was placed on deferred adjudication community supervision. In 2017, her community supervision was revoked, and she was adjudicated guilty of the offense and assessed punishment of confinement for 12 months.

The trial court also admitted a 2017 judgment of conviction in which Mother pleaded guilty to a 2016 offense of manufacture and delivery of a controlled substance and was assessed punishment of confinement for two years.

There was also evidence that, on January 22, 2021, Mother again committed the offense of possession of a controlled substance (methamphetamine). Specifically, in an order dated January 18, 2022, Mother pleaded guilty to the offense, adjudication of her guilt was deferred, and she was placed on community supervision for four years.

Kalichman testified that, under the FSP, Mother was ordered to complete inpatient substance-abuse treatment, which she had completed. And, up until April 2022, Mother was otherwise compliant with her FSP. Accordingly, the trial court

8

granted a monitored return of Beth to Mother. Shortly thereafter, however, the situation deteriorated, and the monitored return was revoked.

On July 2, 2022, Mother was arrested for driving while intoxicated. Based on her arrest, the State moved to revoke Mother's community supervision and adjudicate her guilt for the 2021 offense of possession of methamphetamine. Kalichman testified that she was concerned that if Mother were assessed confinement, she would again be unable to care for Beth.

Kalichman further testified that Mother complied with drug testing on July 28, 2022, and the results were negative. However, Mother "missed everything else after that." Mother was asked to test in August and September, but did not comply.

Also pursuant to the FSP, Mother was to visit Beth twice monthly. The first visit was canceled due to Beth's illness, but Mother did not attend any of the scheduled visits thereafter. Kalichman noted that, as of the time of trial in October 2022, Mother had not been in touch with DFPS or inquired about Beth since August 2022, when Mother sent a text to Kalichman. Kalichman sent Mother a Zoom mediation link in September, but she did not respond.

Based on the foregoing, Kalichman opined that appointing Mother as Beth's permanent managing conservator would significantly impair Beth's physical and emotional well-being and that termination of Mother's parental rights was in Beth's best interest. Kalichman noted that Beth's foster home placement offered

9

consistency and was a home "filled with love and safety and security." Beth had a preexisting relationship with her placement family and was part of the family.

Manvel Police Officer J. Livingston testified that, while on patrol at around 2:30 a.m. on July 2, 2022, he came upon Mother stopped on the side of Highway 6 in Manvel, Texas. Mother's car had major front-end damage, including a fender "wrapped around the front tire." Mother stated that she had been at a nightclub in Houston. Officer Livingston noted that Mother could not maintain her balance and was uneasy on her feet, that her eyes were "glossy and red," and that her pupils were slightly dilated. She had slurred speech and "she didn't know exactly where she was." After conducting field sobriety tests, Officer Livingston arrested Mother for the offense of driving while intoxicated. He noted that Mother stated that she wanted to get home to her kids, who were at home in Texas City.

Foster mother A.H. testified that Beth first came into her care from DFPS in 2019, when she was five months old, and stayed for "a few months." Subsequently, at around 3:00 a.m. on December 31, 2020, DFPS returned Beth to A.H.'s care, where she remained for "[a]lmost a full year." Finally, in July 2022, Beth again returned to A.H.'s care, where she remained at the time of trial.

Each time she returned, Beth remembered A.H. and "just went right into [their] routine" in the household—which is comprised of A.H., her husband, their daughter, and twin boys. A.H. testified that Beth was "completely nonverbal" when

10

she came to them the second time, but had since remarkably improved. She characterized Beth as "joyful and bright-eyed and quick-witted." A.H. is a first-grade teacher and has lunch with Beth during the school day. Beth is observant and interacts well with her peers at school. With respect to the foster family's plans for Beth, A.H. stated: "We would love to adopt and to have her forever."

At the close of trial, DFPS requested that the trial court terminate Mother's parental rights under subsections 161.001(b)(1)(D), (E), and (O) of the Family Code.

In its Order of Termination, the trial court found that termination of the parent-child relationship between Mother and Beth was in Beth's best interest[8] and that Mother had knowingly placed, or knowingly allowed Beth to remain, in conditions that endangered her physical or emotional well-being[9]; that Mother engaged, or knowingly placed Beth with others who engaged, in conduct that endangered her physical or emotional well-being[10]; and that Mother had failed to comply with a court order establishing the actions necessary for her to obtain Beth's return.[11] The trial court terminated Mother's parental rights and appointed DFPS as Beth's permanent managing conservator.

---

[8] *See* TEX. FAM. CODE § 161.001(b)(2).

[9] *See id.* § 161.001(b)(1)(D).

[10] *See id.* § 161.001(b)(1)(E).

[11] *See id.* § 161.001(b)(1)(O).

11

**Termination of Mother's Parental Rights**

In her sole issue, Mother argues that the evidence at trial was legally and factually insufficient to support the trial court's findings that she engaged in the predicate acts set forth in subsections 161.001(b)(1)(D), (E), and (O) of the Family Code and that termination of her parental rights was in Beth's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), and (O), (b)(2).

*Standard of Review*

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"[T]he rights of natural parents are not absolute," however, "protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit her parental rights based on her actions

or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Accordingly, "[i]n parental-rights termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see also* TEX. FAM. CODE § 161.001(b). "Clear and convincing" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

"To that end, in reviewing a legal-sufficiency challenge, we must determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* (internal quotations omitted). "[W]e look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). We may not, however, "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted).

In conducting a factual-sufficiency review in this context, we determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that the finding was true. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

*Discussion*

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2). Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a

14

court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d at 232).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E), "the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under *either* can serve as a ground for termination of [her] rights to *another* child." *Id.* (first emphasis added); *see* TEX. FAM. CODE § 161.001(b)(1)(M). "[B]ecause prior termination for endangerment is a predicate ground for a future termination, due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) *and* (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704 (emphasis added); *see In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding that because both fathers challenged trial court's findings under subsections (D) and (E), thus implicating due process concerns, "we begin our sufficiency of the evidence analysis with these two subsections").

15

Here, the trial court found that Mother:

(D)　knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E)　engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [and]

. . . .

(O)　failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [DFPS] . . . for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

TEX. FAM. CODE § 161.001(b)(1)(D), (E), and (O).

Mother argues on appeal that the evidence at trial was legally and factually insufficient to support the trial court's finding on any of these predicate grounds and insufficient to support its finding that termination of her parental rights was in Beth's best interest. Because Mother challenges the trial court's findings under subsections (D) and (E), thus implicating due process concerns, we address these two subsections. *See In re M.P.*, 639 S.W.3d at 704; *In re M.D.M.*, 579 S.W.3d at 764; *see, e.g.*, *In re H.L.W.*, No. 01-21-00654-CV, 2022 WL 16756688, at *15 (Tex. App.—Houston [1st Dist.] Nov. 8, 2022, no pet.) (mem. op.). We address these sections out of order to facilitate the discussion in this case.

16

*Section 161.001(b)(1)(E)*

Section 161.001(b)(1)(E) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, a parent's "consistent failure to take advantage of many forms of assistance made available to her to help provide safe and stable living conditions for [the child] may warrant termination of parental rights." *See Smith v. Tex. Dep't of Fam. & Protective Servs.*, No. 01-09-00173-CV, 2009 WL 4359267, at *7 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.) (mem. op); *see also Phillips v. Tex.*

17

*Dep't of Protective & Regul. Servs.*, 25 S.W.3d 348, 352, 354 (Tex. App.—Austin 2000, no pet.) (holding that parent's lack of progress toward stabilizing home constituted evidence of endangering conduct under subsection (E)).

In addition, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. Further, a parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *Id.* at 831–32 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission. . . ." *Id.* at 831. A parent's conduct prior to the child's birth and either before or after the child's removal by DFPS may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring prior to the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the effect of endangering the child. *Id.* "A parent's past endangering conduct may create an inference that the conduct may recur and further jeopardize the child's present or

future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

"[D]anger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury." *Jordan v. Dossey*, 325 S.W.3d 700, 723–24 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under [sub]section (E) has been established."). To support termination under subsection (E), it is not necessary to establish that a parent intended to endanger the child. *In re J.D.G.*, 570 S.W.3d at 851. And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

Here, DFPS presented evidence that Mother engaged in a continuing course of criminal activity both before and after Beth's birth in 2019 and that continued during the pendency of this case. Specifically, the evidence includes a judgment reflecting that, in 2013, Mother committed the offense of possession of a controlled substance (methamphetamine) and was placed on deferred adjudication community supervision. In 2017, the criminal trial court adjudicated her guilt and assessed punishment of confinement for 12 months.

The evidence also includes a 2017 judgment of conviction in which Mother pleaded guilty to a 2016 offense of manufacture and delivery of a controlled

substance, and the criminal trial court assessed her punishment at confinement for two years.

The evidence also includes a January 2022 order of deferred adjudication, in which Mother pleaded guilty to the commission of possession of a controlled substance (methamphetamine) on January 22, 2021, and the criminal trial court deferred adjudication of her guilt and placed her on community supervision for four years. Notably, Mother committed this offense just three weeks after DFPS filed the instant suit and issued an emergency order removing Beth from her custody—that is, at a time at which Mother knew that her parental rights were in jeopardy.

The evidence further shows that Mother subsequently completed inpatient substance abuse treatment and was, at least until April 2022, compliant with her FSP. At that time, the trial court granted a motion by DFPS for the monitored return of Beth to Mother.

However, just three months later, on July 2, 2022, while Beth was still in Mother's care on a monitored return, Mother was arrested for the offense of driving while intoxicated. *See In re V.V.*, 349 S.W.3d at 554 (stating endangering conduct includes criminal activity because such activity exposes parent to incarceration); *Walker*, 312 S.W.3d at 617 ("If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child."). And the State moved to revoke Mother's community supervision and

20

to adjudicate her guilt for the 2021 offense of possession of methamphetamine. Violating the terms of community supervision constitutes endangering conduct. *See Robinson v. Tex. Dep't of Protective & Regul. Servs.*, 89 S.W.3d 679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding parent's violation of terms of community supervision constituted endangering conduct for purposes of section 161.001(b)(1)(E)). The matter was pending at the time of trial in the instant case. And Kalichman testified that she was concerned that if Mother were assessed confinement, she would again be unable to care for Beth.

In her brief, Mother argues that "no evidence of any drug use by [her] at any time was presented at all." However, as discussed above, illegal drug activity supports the trial court's finding. *See Walker*, 312 S.W.3d at 617 ("Conduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child.").

In addition, the record shows that the trial court ordered Mother to comply with the terms of the FSP—the order and FSP were both admitted at trial. The terms of the FSP required Mother to fully cooperate and actively participate in random alcohol and drug screening, and states that a failure to submit to a drug screen "will be considered a positive result." Kalichman testified that, although Mother complied with drug testing on July 28, 2022, she "missed everything else after that." Thus,

21

the trial court could reasonably infer that Mother's failure to submit to the court-ordered drug screening indicated that she was avoiding testing because she was using drugs. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Moreover, the record shows that Mother's counsel essentially conceded Mother's substance abuse at trial, in her cross-examination of the foster parent, as follows:

Q.   Okay. So—and you're aware that [Mother] has a history of drug problems?
A.   Yes, ma'am.
Q.   Has been in rehab several times?
A.   Yes, ma'am.
Q.   And, so, it's going to [be a] struggle for her?
A.   Right.

From this evidence, the trial court could have reasonably concluded that Mother's history of illegal drug activity, which continued during the pendency of this case, including during the monitored return, constituted a course of conduct that endangered Beth's physical and emotional well-being. *See J.O.A.*, 283 S.W.3d at 345; *In re N.J.H.*, 575 S.W.3d at 831–32; *Walker*, 312 S.W.3d at 617 ("Even though three of these offenses occurred before W.J.W. was born, they can still be considered as part of a voluntary, deliberate, and conscious course of conduct that had the effect of endangering W.J.W.").

22

Moreover, viewing all the evidence in the light most favorable to the trial court's subsection (E) finding and considering undisputed contrary evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in conduct that endangered Beth's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.W.*, 645 S.W.3d at 741. Further, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that Mother engaged in conduct that endangered Beth's physical or emotional well-being. *In re C.H.*, 89 S.W.3d at 25–26. Thus, we hold that the evidence legally and factually sufficient to support the trial court's finding.

### *Section 161.001(b)(1)(D)*

Section 161.001(b)(1)(D) of the Family Code authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D).

To establish subsection (D), DFPS must prove that the parent's conduct caused a child to be placed or remain in an "endangering environment." *In re J.W.*, 645 S.W.3d at 749; *Jordan*, 325 S.W.3d at 721. The suitability of the child's living

conditions and the conduct of parents or others in the home are relevant to this inquiry. *In re J.W.*, 645 S.W.3d at 749.

"Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan*, 325 S.W.3d at 721. "A parent's illegal drug use and drug-related criminal activity may also support a finding that the child's surroundings endanger his or her physical or emotional wellbeing." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). Under subsection (D), termination may be based upon a single act or omission. *Jordan*, 325 S.W.3d at 721.

Here, as discussed above, the evidence shows that while Beth was in Mother's care on a monitored return—while her parental rights were in jeopardy—Mother became intoxicated and was arrested for the offense of driving while intoxicated. *See In re V.V.*, 349 S.W.3d at 554 ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child."); *Boyd*, 727 S.W.2d at 533 ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.").

At the time of her arrest, Mother was also on deferred adjudication community supervision, having pled guilty to possession of methamphetamine just six months prior—for an offense she committed in January 2021, three weeks after Beth was

24

removed from her custody and the instant suit was filed. And, based in part on her arrest for DWI, the State moved to revoke Mother's community supervision and to adjudicate her guilt for violating the terms of her community supervision. Thus, by her conduct, Mother subjected herself to further incarceration and subjected Beth to being left without Mother's care. *See Jordan*, 325 S.W.3d at 721 (holding unlawful conduct by persons who live in child's home constitutes part of conditions or surroundings of child's home under subsection (D)).

In addition, the evidence shows that Meyers found Beth at a residence in the care of Miller, Torres, and Alicorn. They reported that Beth had been there for four days and that they had no way to reach Mother. Meyers found Beth lying on a "dirty bare mattress on the floor," with a half-empty bottle of beer near her. Meyers noted that Miller had a recent conviction for possession of methamphetamines, Torres was a registered gang member, and Alicorn's children had been removed from her care due to drugs, and she was prohibited from having unsupervised contact with them. DFPS conducted an emergency removal of Beth and placed her back into foster care with her previous caregiver.

From this evidence, the trial court could have reasonably concluded that Mother, having left Beth for several days—with an indeterminate end—and having left no contact information for the caregivers, had knowingly placed Beth under conditions that endangered her physical or emotional well-being. In addition, the

25

trial court could have reasonably concluded that Mother either knew that Miller, Torres, and Alicorn were not suitable caregivers for a child or that Mother did not take reasonable steps to determine their suitability. Further, Beth was found in dirty conditions and with apparent access to alcohol.

Viewing all the evidence in a light most favorable to the trial court's finding, and considering undisputed contrary evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed [Beth] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.W.*, 645 S.W.3d at 741.

Furthermore, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Beth to remain in conditions or surroundings that endangered her physical or emotional well-being. *See In re C.H.*, 89 S.W.3d at 25–26. Thus, we hold that the evidence is legally and factually sufficient to support the trial court's finding.

Because the evidence supports termination of Mother's parental rights under subsections 161.001(b)(1)(D) and (E), we need not separately address the trial court's other predicate ground for termination. *See In re N.G.*, 577 S.W.3d at 236–

26

37; *In re I.F.*, No. 01-22-00375-CV, 2022 WL 16640627, at *7 (Tex. App.—Houston [1st Dist.] Nov. 3, 2022, no pet.) (mem. op.).

***Best Interest of the Child***

Mother contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in Beth's best interest.

The Texas Legislature has set out a list of factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) whether there is a history of abusive or assaultive conduct or substance abuse by the child's family or others who have access to the child's home; (6) the willingness of the child's family to seek out, accept, and complete counseling services; (7) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (8) whether the child's family demonstrates adequate parenting skills. TEX. FAM. CODE § 263.307(b).

The Texas Supreme Court has also set out the following list of non-exclusive factors to guide a determination of the best interest of the child: (1) the desires of the

27

child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the proposed placement, (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

It is not necessary that DFPS prove all of these factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in a child's best interest. *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Importantly, the analysis may include direct and circumstantial evidence, the totality of the evidence, and subjective factors. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

Based on these standards, several factors support the trial court's finding here that termination of Mother's parental rights is in Beth's best interest.

At the time of trial, Beth was three years old. "When children are too young to express their desires, the fact finder may consider that the children have bonded

28

with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Beth was first placed into foster care when she was five months old. She stayed with A.H. for "a few months" before going to stay with Mother's aunt. Then, in December 2020, DFPS returned Beth to A.H.'s care, where she remained for almost a year. Finally, in July 2022, Beth again returned to A.H.'s care, where she remained at the time of trial, in October 2022.

Thus, by the age of three, Beth had been removed from Mother's care and placed in foster care three times. *See* TEX. FAM. CODE § 263.307(b) (frequency of out-of-home placements). And Beth had spent roughly half of her life with her foster family. *See In re J.D.*, 436 S.W.3d at 118. Beth's foster mother, A.H., testified that Beth had bonded with the family, and that, each time she returned, Beth remembered A.H. and "just went right into [their] routine" in the household. *See id.* Beth was "joyful and bright-eyed and quick-witted." *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (considering, in assessing child's physical and emotional needs, that child was "healthy, happy, and well-adjusted" after approximately eighteen months in care of foster family).

At the time of trial, Mother had not attended her scheduled visitations with Beth or contacted DFPS about Beth since August—when she contacted DFPS via

text.  Thus, Beth had not seen Mother in two months.  A.H. noted that Beth no longer asked about Mother. *See In re A.J.D.-J.*, No. 01-22-00724-CV, —S.W.3d—, 2023 WL 2655736, at *6 (Tex. App.—Houston [1st Dist.] Mar. 28, 2023, no pet. h.) ("Parental absence or lack of involvement is especially telling with respect to the best interest of very young children, like babies and toddlers, due to their inherent vulnerability and particular need for parental attention and nurturing.").

In addition, Mother failed to attend trial.  She was, in her attorney's words, "AWOL."  "[W]hen a parent fails to attend trial in a parental-termination case without a valid excuse for his or her failure to do so, the factfinder may reasonably infer that the parent is indifferent to the outcome." *Id.* at *8.  "[I]ndifference implicates all of the *Holley* factors." *Id.* at *9.

With respect to Beth's vulnerabilities at the age of three and Mother's acts and omissions, Meyers testified that, on December 26, 2020, a newspaper delivery man had reported to law enforcement that he had seen a small child, "around age of two," outside of Mother's house at 2:00 in the morning.  When officers arrived, they noted that Mother's house smelled like marijuana.  Once they determined that Beth was safely inside the house, they left.  "They were called back within a short time," however, because Mother alleged that she had been assaulted by Father.  Law enforcement reported the incident to DFPS, and Meyers was assigned to investigate.

As discussed above, Meyers ultimately found Beth at a residence in the care of Miller, Torres, and Alicorn. Meyers noted that Miller had a recent conviction for possession of methamphetamines, and Torres was a registered gang member. Alarcon's children "had been removed from her care due to allegations of drugs," and "she had a restriction that [she] shouldn't be around her children unsupervised." Meyers found Beth in the house, lying on a "dirty bare mattress on the floor," with a half-empty bottle of beer near her. Torres said that Beth had been in his care for four days and that he did not have a way to reach Mother. This evidence weighs in favor of the trial court's best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *In re B.D.A.*, 546 S.W.3d 346, 361 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding that children ages seven, five, and four at time of trial were too young and vulnerable to be left in custody of parent unable or unwilling to protect them).

Conversely, with respect to the foster parents' abilities to parent Beth and to provide a stable home, and their plans for her, the evidence shows that Beth is in a safe, stable home and that she is thriving. Foster mother A.H. testified that Beth was "completely nonverbal" when she came to them the second time, but she has since remarkably improved. She is observant and interacts well with her peers at school. A.H. noted that she is a first-grade teacher and is able to have lunch with Beth during the school day. *See Holley*, 544 S.W.2d at 371–72.

31

A.H. further testified that Beth is bonded with her foster parents and siblings, and that she and her husband would like to adopt Beth. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming finding that termination was in child's best interest when child was thriving in foster care).

Because the trial court heard directly from the foster mother, we defer to the trial court's assessment of her credibility and demeanor in crediting this testimony as evidence in favor of the trial court's best-interest finding. *See In re J.F.-G.*, 627 S.W.3d at 312; *In re S.G.A.R.*, No. 01-18-00291-CV, 2018 WL 4705835, at *7 (Tex. App.—Houston [1st Dist.] Oct. 2, 2018, pet. denied) (mem. op.).

With respect to programs available to assist Mother in promoting Beth's best interest, the trial court may consider whether she complied with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). Here, as she argues on appeal, Mother's compliance with certain court-ordered tasks during the termination proceedings weighs in her favor and against the best-interest finding. However, the evidence also shows that Mother was subsequently unable to refrain from becoming intoxicated and was arrested while Beth was in her care on monitored return. *See In re C.A.J.*, 122 S.W.3d 888, 893–94 (Tex. App.—Fort Worth 2003, no pet.) (stating that courts may consider parent's poor judgment and lack of stability in considering best interest).

In addition, Mother failed or refused to comply with drug testing after July 2022. Again, the trial court ordered Mother to comply with the terms of the DFPS FSP, and the order and FSP were admitted at trial. The FSP required Mother to fully cooperate and actively participate in random alcohol and drug screening, and states that that a failure to submit to a drug screen "will be considered a positive result." Kalichman testified that, although Mother complied with drug testing on July 28, 2022, she "missed everything else after that." Thus, the trial court could reasonably infer that Mother's failure to submit to the court-ordered drug screening indicated that she was avoiding testing because she was using drugs. *See In re C.A.B.*, 289 S.W.3d at 885.

Drug use is relevant, not only to parenting abilities and to the stability of the home a parent would provide, but also to the emotional and physical needs of the child, now and in the future, and to the emotional and physical danger in which the child could be placed, now and in the future. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, four, and seven); *see also In re C.H.*, 89 S.W.3d at 28 (holding that same evidence may be probative of both section 161.001(b)(1) and best-interest grounds); *In re A.C.*, 394 S.W.3d at 642. A factfinder may afford great weight to the significant factor of drug-related conduct. *In re M.L.G.J.*, 14-14-00800-CV, 2015 WL 1402652, at *7 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.).

Thus, viewing all the evidence in a light most favorable to the trial court's best-interest finding, and considering any undisputed evidence to the contrary, we conclude that a reasonable factfinder could have formed a firm belief or conviction that a termination of Mother's parental rights is in Beth's best interest. *See In re J.W.*, 645 S.W.3d at 741.

Furthermore, considering the entire record, including evidence both supporting and contradicting the trial court's finding, a factfinder reasonably could have formed a firm belief or conviction that a termination of Mother's parental rights is in Beth's best interest. *In re C.H.*, 89 S.W.3d at 25–26. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See In re A.C.*, 560 S.W.3d at 630–31.

We therefore overrule Mother's sole issue on appeal.

## Conclusion

We affirm the trial court's order of termination in all things.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.

34